ORIGINAL

FILED

2009 JAN -8  PM 1:51

SOUTHERN DISTRICT OF CALIFORNIA

BY _____ VMR
                        DEPUTY

1  Harold M. Hewell (Cal. SBN: 171210)
2  Hewell Law Firm
   105 West F Street, Suite 213
3  San Diego, California 92101
   Tel: (619) 235-6854
4  Fax: (888) 298-0177
   E-mail: hmhewell@hewell-lawfirm.com
5  *Attorney for Plaintiff*

6

7

8                 **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10 **RABBI S. BINYOMIN GINSBERG**, as        : Civil Action No.:
11 an individual consumer, and on behalf of all   : **'09 CV 0028 JLS NLS**
   others similarly situated,                 : **COMPLAINT FOR:**
12                                             :
13     *Plaintiff,*                            :   **(1) BREACH OF CONTRACT;**
                                               :
14                                             :   **(2) BREACH OF THE COVENANT**
                                               :       **OF GOOD FAITH AND FAIR**
15                                             :       **DEALING;**
                                               :
16 *vs.*                                       :   **(3) NEGLIGENT**
                                               :       **MISREPRESENTATION; AND**
17                                             :
                                               :   **(4) INTENTIONAL**
18                                             :       **MISREPRESENTATION**
                                               :
19                                             : *Class Action*
                                               :
20                                             : *Jury Trial Requested*
21                                             :
22                                             :            **BY FAX**
                                               :
23 **NORTHWEST, INC.,** a Minnesota           :
24 corporation and a wholly-owned subsidiary   :
   of Delta Air Lines, Inc., and **DELTA AIR** :
25 **LINES, INC.,** a Delaware corporation,    :
                                               :
26     *Defendants.*                           :
27                                             :
28

---

**COMPLAINT FOR: BREACH OF CONTRACT; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR
DEALING; NEGLIGENT MISREPRESENTATION; AND INTENTIONAL MISREPRESENTATION**

Plaintiff alleges:

## I. PARTIES

1.      Plaintiff Rabbi S. Binyomin Ginsberg is an individual consumer and a citizen of Minnesota. He brings this action as individual, and on behalf of all others similarly situated. Plaintiff respectfully requests a jury trial.

2.      Defendant Northwest, Inc. ("Northwest") is a Minnesota corporation and a wholly-owned subsidiary of Delta Air Lines, Inc. Northwest lists with the California Secretary of State a principal place of business located at 2700 Lone Oak Parkway, Eagan, Minnesota 55121-1534, and a registered agent for service of process by the name of C T Corporation System, 818 West Seventh Street, Los Angeles, California 90017. Thus, for purposes of diversity jurisdiction, Northwest can be considered a "citizen" of Minnesota.

3.      Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation which lists with the California Secretary of State its principal place of business address as P.O. Box 45852, Atlanta, Georgia 30320, and a registered agent for service of process by the name of Corporation Service Company Which Will Do Business In California as CSC - Lawyers Incorporating Service 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833. Thus, for purposes of diversity jurisdiction, Delta can be considered a citizen of Delaware or Georgia.

## II. VENUE AND JURISDICTION

4.      This Court enjoys jurisdiction over the subject matter presented by this Complaint because it is filed as a class action arising under the Class Action Fairness Act ("CAFA") of 2005, 28 U.S.C. § 1332(d)(2) and 28 U.S.C. § 1332(d)(6), which explicitly provides for original jurisdiction in the Federal Courts of any class action in which any member of the plaintiff Class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual class members in this action are in excess of $5,000,000.00 in the aggregate as required by 28 U.S.C. § 1332(d)(2), (5). Plaintiff is a citizen of Minnesota; Delta, for purposes of diversity jurisdiction, can be considered a citizen

of either Delaware or Georgia. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2). Furthermore, pursuant to 28 U.S.C. § 1332(d)(4)(a)(i)(I), plaintiff alleges that more than two-thirds of all of the members of the proposed plaintiff Class in the aggregate are citizens of a state other than California, where this action is originally being filed, and that the total number of members of the proposed plaintiff Class is greater than 100, as required by 28 U.S.C. § 1332(d)(5)(B).

5.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because defendant may be found in, conducts business in, and is subject to personal jurisdiction in this district.

### III. GENERAL ALLEGATIONS

6.      All allegations in this Complaint are based on information and belief and/or are likely to have evidentiary support after reasonable opportunity for further investigation or discovery.

7.      Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the defendants and each of their related entities was the agent, servant and employee of each of the other entities, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Plaintiff is further informed and believes and thereon alleges that, at all times herein mentioned, each of those entities' employees was the agent, servant and employee of each employee's respective employer, and at all times herein mentioned, each employee was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of either of the defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of that respective defendant committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of that respective defendant while actively engaged in the scope of their duties.

### IV. FACTUAL ALLEGATIONS

8.      According to a report filed October 31, 2008, with the U.S. Securities and Exchange Commission, Northwest and Delta merged on October 29, 2008, and as a result of

that merger, Northwest became a wholly-owned subsidiary of Delta. The merger was the result of an Agreement and Plan of Merger the parties had entered into, dated April 14, 2008.[1]

9.      Also as a result of that merger, Delta became the world's largest airline, with hubs in Atlanta, Cincinnati, Detroit, Memphis, Minneapolis-St. Paul, New York-JFK, Salt Lake City and Tokyo-Narita. Delta and its Northwest subsidiary now offer service to more than 375 destinations in 66 countries, and serve more than 170 million passengers each year.

10.      The merger purportedly preserved Northwest's customer loyalty program, known as "WorldPerks." An October 29, 2008, press release announcing the merger stated that there would be "immediate complimentary upgrade reciprocity for *elite* members of both airlines' loyalty programs, with airport lounge reciprocity continuing as usual."[2] A website by Northwest, explaining the effect of the merger on Northwest customers, stated: "During the regulatory review period, *it is business as usual - with no changes to the WorldPerks program.* After the merger closes, customers will be able to fly to more destinations.... *This transaction will have no impact on WorldPerks miles or elite status* (emphasis added throughout)."[3]

11.      The representations made by defendants, as set forth in the two preceding paragraphs, are false, as shown below.

12.      Plaintiff has long been a customer of Northwest, and has been a member of the WorldPerks loyalty program ("Program") since 1999. As Dean of Torah Academy of Greater Minneapolis, a parochial Primary and Middle school and a member-school of Torah U'mesorah, an international association of Jewish Day schools, he has achieved widespread recognition for his accomplishments in education and administration. He travels extensively throughout the United States and abroad for speaking engagements, to conduct seminars and workshops, and to advise other educators and administrators. As a result of that extensive travel, plaintiff achieved

---

[1] Form 8-K, DELTA AIR LINES INC /DE/ - DAL, Filed: October 31, 2008 (period: October 29, 2008).

[2] Press Release dated October 29, 2008 titled "Delta and Northwest Merge, Creating Premier Global Airline."

[3] http://www.nwa.com/features/mergerqa/.

1 Platinum Elite status in the Program in 2005.

2        13.    Prior to moving to Minneapolis, plaintiff and his wife had lived in Seattle,

3 Washington. Air travel in and out of Minneapolis and Seattle was dominated by Northwest;

4 while living in these cities, plaintiff and his wife readily qualified as "frequent fliers," entitled to

5 benefits under the loyalty Program: they logged, on average, approximately 75 flights on

6 Northwest each year. As of this filing, plaintiff and his wife continue to fly frequently, at

7 approximately the same rate, and do so almost exclusively on Northwest.

8        14.    Despite their frequent flights on Northwest and their loyalty to the airline,

9 Northwest has arbitrarily rescinded plaintiff's Platinum Elite status in the Program. This

10 occurred less than three months after defendants entered into the Agreement and Plan of

11 Merger, dated April 14, 2008, and approximately four months before the merger became final.

12        15.    On Friday, June 27, 2008, while plaintiff and his wife were driving from Detroit

13 to Chicago, he received a call on his cell phone from a Northwest representative who told him

14 that Northwest was revoking his Platinum Elite status because he had purportedly "abused" the

15 Program. Northwest had given plaintiff no prior notice that he had done anything to endanger

16 his program status, or that his Program status was at risk. In fact, at the time he received this

17 call, his Platinum Elite card was valid through February 2009. Plaintiff asked the representative

18 to explain the alleged "abuse," and was told the airline had determined that he had called the

19 Customer Care line with complaints "too many times," that he had been bumped from flights

20 "too often," and that he had purposely booked reservations on "full flights" with the intention of

21 getting bumped.

22        16.    Plaintiff asked the Northwest agent for her name and phone number so that he

23 could call her back when he was not driving and had access to his Program records. The

24 representative said that her name was Irene James, but she refused to give him a phone number,

25 stating there was nothing more to discuss and that she would not be speaking to him again. Ms.

26 James told plaintiff he would receive a letter from Northwest's Customer Care department

27 within a few days officially revoking his status, and explaining in detail what he had done to

28 warrant the revocation.

17.     The next week, after returning home, plaintiff contacted Northwest's legal department about the revocation. He spoke with Chris Jenkins Weiner, who agreed to look into it. Ms. Weiner called plaintiff back the next day and told him that Northwest had "the right" to terminate his Program membership "at any time," and that the termination "was fair." Ms. Weiner continued, adding that Northwest also was revoking the Silver Elite Program status earned by plaintiff's wife. Ms. Weiner claimed that plaintiff had been called once prior to June 27, 2008 and had been warned of Northwest's intent to revoke his Program status because of the alleged abuses. Like Ms. James, Ms. Weiner assured plaintiff that Northwest was sending a letter to formally notify plaintiff and his wife of the revocations. Plaintiff had received no warnings and told this to Ms. Weiner. Her reply was not responsive: she claimed plaintiff had "violated" before the June 27, 2008 call from Ms. James, and told him the forthcoming letter would explain the basis for Northwest's action.

18.     The promised correspondence had not arrived as of July 13, 2008, when plaintiff was scheduled to fly from Minneapolis/St. Paul to New York JFK. Plaintiff arrived early to the airport and decided to wait for his flight at Northwest's WorldClub at Minneapolis/St. Paul Airport in the C concourse. He had renewed and paid for his WorldClub membership on June 18, 2008, and no one, including Ms. Weiner and Ms. James, had told him that revocation of his Program status would affect his WorldClub membership. However, when plaintiff presented his WorldClub card to the receptionist, he was denied entry and was told that his WorldClub membership had been cancelled with his Platinum Elite status because he had paid for the renewed membership at the Platinum Elite discounted price. The Northwest representative told plaintiff that because he no longer held Platinum Elite status, the WorldClub membership was invalid. This was incorrect, of course, because he had paid for his WorldClub membership on June 18, 2008, nine days before Ms. James called him and first raised the revocation of his status. Plaintiff's Platinum Elite status was in effect when he paid for the WorldClub membership, and he was entitled to the discount that came with that status.

19.     Plaintiff was allowed to enter the WorldClub after an extended discussion with the agent in charge. However, the humiliation he experienced because of the incident prevented

1   him from enjoying his WorldClub membership or any other aspect of travel with Northwest

2   from that point forward, as he was concerned that a similar incident could occur at any time.

3        20.    On July 23, 2008, plaintiff received another call on his cell phone from Ms.

4   James. She warned him that if any more of his friends called Northwest and questioned his

5   treatment at the hands of the airline, Northwest would provide them with details regarding his

6   alleged abuse of Program privileges (details that, ironically, Northwest has to date withheld

7   from him). Ms. James said she had checked with the airline's legal department and had been

8   told that divulging these allegations to third parties was permitted, as long as she first warned

9   plaintiff.

10       21.    During that conversation, plaintiff asked that he be given the opportunity to

11  discuss the allegations against him when he had access to his records. Ms. James told him that

12  she would call him at 2:00 p.m. CDT, July 25, 2008, for that purpose. However, she did not do

13  so.

14       22.    Plaintiff continued to wait for Northwest's promised letter, hoping it would shed

15  light on the alleged abuses of the Program, as well as provide written confirmation of his

16  Program status.

17       23.    Plaintiff subsequently received a letter dated July 18, 2008, from Kathy Johnston,

18  coordinator of Customer Care at Northwest. It stated in part that: "[d]ue to our past generosity,

19  we must respectfully advise that we will no longer be awarding you compensation each time

20  you contact us…. If compensation is warranted and provided to other passengers for issues like

21  a flight irregularity, you will receive like consideration" A true and correct copy of the letter

22  from Ms. Johnston is attached to this Complaint as Exhibit "A" and incorporated by reference.

23       24.    There was no reference in the Johnston letter to the revocation of the Program

24  status plaintiff had enjoyed for many years. Northwest representatives had assured plaintiff that

25  a forthcoming letter would provide the factual basis for Northwest's revocation and clarify the

26  state of his and his wife's membership status in the Program, but the Johnston letter contained

27  no such information.

28       25.    Plaintiff spent the next two months trying to ascertain the relationship, if any,

that he and his wife had with Northwest. However, he received nothing but inconsistent information from Ms. Weiner, Ms. James, and Ms. Johnston.

26.     In August 2008, a Minnesota attorney wrote Northwest's legal department on plaintiff's behalf in an effort to resolve the impasse, but Northwest did not respond.

27.     Plaintiff, who was still maintaining a heavy flight schedule on Northwest, was frustrated with the uncertainty of his Program status. After nine years of active participation in the Program, with his loyalty benefits, rights and privileges defined by written agreements, Northwest had "revoked" his status with a call to his cell phone. The letter from Ms. Johnston was the only letter he had received since that call, and it did nothing to resolve the uncertainty of his Program status, or that of his wife.

28.     Plaintiff continued to seek clarification of his status with Northwest, and on November 20, 2008, he received an email from Kathy Johnston stating in part:

Please allow me to review Rule #7 of our WorldPerks Terms and Conditions.

Rule #7 states the following.

"Abuse of the WorldPerks program (including failure to follow program policies and procedures, the sale or barter of awards or tickets and any misrepresentation of fact relating thereto or other improper conduct as determined by Northwest in its sole judgment, including, among other things, violation of the tariffs of Northwest or any Airline Partner participant in the program, any untoward or harassing behavior with reference to any Northwest employee or any refusal to honor Northwest Airlines employees; instructions) may result in cancellation of the members' account and future disqualification from program participation, forfeiture of all mileage accrued and cancellation of previously issued but unused awards. Any violation of these rules may result in confiscation of tickets at any time (including en route) and the payment by the WorldPerks member or passenger of the full applicable Y, C, J, F or P fare for any segment traveled on program award tickets that have been misused. In connection with the enforcement of any of the terms and conditions governing the WorldPerks

1   program, Northwest Airlines reserves the right to take appropriate legal action, as

2   it deems necessary, and to recover damages, attorneys (sic) fees and court costs.

3   A true and correct copy of the email, redacted to maintain the privacy of email addresses, is

4   attached to this Complaint as Exhibit "B" and incorporated by reference. A true and correct

5   copy of the "WorldPerks® General Membership Terms and Conditions"

6   (http://www.nwa.com/worldperks/memrules/general.shtml) is attached to this Complaint as

7   Exhibit "C" and incorporated by reference.

8       29.    Neither the November 20, 2008, email from Kathy Johnston nor any other

9   communication from Northwest specified exactly what plaintiff had allegedly done to violate

10  "Rule #7." Given that plaintiff has neither engaged in, nor been accused of, "failure to follow

11  program policies and procedures" or "the sale or barter of awards or tickets and any

12  misrepresentation of fact relating thereto," plaintiff can only conclude that Northwest was

13  asserting that he had engaged in "other improper conduct *as determined by Northwest in its sole*

14  *judgment*, including, among other things … untoward or harassing behavior with reference to

15  any Northwest employee or any refusal to honor Northwest Airlines employees' instructions…

16  (emphasis added)." [4]

17      30.    However, this provision of the Terms and Conditions is so impossibly vague and

18  ambiguous that no reasonable Program member could ever know what is required to comply

19  with it. "Other improper conduct" is not defined, except as ("including, among other things")

20  "untoward or harassing behavior with reference to any Northwest employee or any refusal to

21  honor Northwest Airlines employees' instructions." However, "untoward or harassing behavior"

22  is undefined as well; ambiguity is defined with ambiguity. Northwest compounds the

---

[4] Without clarifying plaintiff's Program status, rights and privileges in any manner in the email, Ms. Johnston concluded with, "We believe that we have fully addressed your concerns, and communicated your change in status with our program. Continued disregard of the policies of this program may result in the termination of your WorldPerks account." Without that clarification, plaintiff still had no indication of what he was doing to violate "the policies of this program" or what Northwest expected of him in terms of compliance. He did not know if he had been relegated to a lesser status in the Program, or removed from it entirely.

uncertainty by broadly asserting that "improper conduct" is to be "determined by Northwest in its sole judgment...."

31.     Northwest cannot contend that plaintiff's service complaints and queries constituted "improper conduct," as he sought nothing more than was promised in Northwest's "Customer Service Commitments," a part of the airline's "Customers First" program. The "commitments" are incorporated into Northwest's Contract of Carriage. A true and correct copy of the "Customer Service Commitments" (http://www.nwa.com/plan/guide01.html) is attached to this Complaint as Exhibit "D" and incorporated by reference.

32.     Additionally, it must be noted that plaintiff's complaints were legitimate, as evidenced by the compensation given and actions taken by Northwest in response to those complaints. Furthermore, plaintiff was not the only Northwest customer who had complaints. A brief review of the Internet reveals a multitude of Northwest customers complaining of similar problems.[5]

33.     By plaintiff's estimate, only about 10 percent of the many Northwest flights he and his wife have taken resulted in problems warranting a call to Northwest's Customer Care. If, as Ms. James asserted, plaintiff complained "too many times," it is because he and his wife fly Northwest frequently; the more they fly, the greater their exposure to problems. The number and frequency of complaints correlate with their loyal, frequent use of Northwest. The complaints do not evidence "abuse," they only show that plaintiff uses the airline often. However, rather than rewarding this loyalty (the purported purpose of the Program), Northwest chose instead to penalize them for registering the complaints that logically arise from frequent flying.[6]

---

[5] See, e.g.:   http://www.consumeraffairs.com/travel/northwest_airlines.htm;
           http://www.my3cents.com/showReview.cgi?id=6070;
           http://www.theimagelab.com/blog/2005/05/25/northwest-airlines-sucks/;
           http://www.my3cents.com/showReview.cgi?id=30806;
           http://blogcritics.org/archives/2006/11/04/101053.php; and
           http://www.all-encompassingly.com/northwest-airlines-is-bankrupt/.

[6] It should be noted that Ms. Johnston's letter addressed a six-month period when plaintiff and his wife had encountered an unusually high number of problems with Northwest, a period that constituted less than 9 percent of their time as Program members. It is no coincidence that this

---

34.     Furthermore, the incidents Northwest cites to bolster its allegation of "abuse" involve circumstances under the sole control of the airline. Plaintiff has no influence or control over Northwest's internal booking policies that result in overbooked flights. Yet, Northwest blames *plaintiff* for being "bumped" excessively.[7] It is absurd on its face that Northwest cites this as abusive behavior on plaintiff's part, when he was the one inconvenienced by Northwest's policies.

35.     Additionally, the validity of plaintiff's complaints is evidenced by Northwest's response to them. As Ms. Johnston stated in her letter to plaintiff:

> I have reviewed the text of all your telephone calls, as well as our responses. I believe our staff has attempted to show you in their words and actions that we are truly sorry your travel has not gone smoothly. ***Because of the nature of our industry, there will continue to be inconveniences caused to our passengers. You certainly deserve our apologies on these occasions.***

Ex. A, ¶ 2 (emphasis added).

36.     If Northwest later came to believe it had compensated plaintiff excessively, this again was in the sole control of Northwest. It is an internal matter; plaintiff did not set compensation levels.

37.     According to the 2008 North America Airline Satisfaction Study$_{SM}$, released June 17, 2008, by J.D. Power and Associates,[8] Northwest tied for last place in a survey of customer satisfaction with eight traditional network carriers. A true and correct copy of the survey, with press release (http://www.jdpower.com/corporate/news/releases/pdf/2008069.pdf)

---

was a time in which the airlines were facing problems industry-wide, including rising fuel costs and a higher rate of flight cancellations.

[7] Again, it should be noted that if plaintiff was in fact bumped a large number of times, it merely correlates with his heavy use of the airline, which sets the booking policies.

[8] J.D. Power and Associates is a global marketing information services company that performs market research, forecasting, performance improvement, training and customer satisfaction surveys. The firm's quality and satisfaction measurements are based on responses from millions of consumers annually.

---

is attached to this Complaint as Exhibit "E."

38.     Plaintiff contends that his complaints were legitimate, and well within the expectations created by the service standards established in Northwest's "Customer Service Commitments," which, as noted above, are incorporated into Northwest's Contract of Carriage.

39.     Plaintiff is informed and believes, and thereon alleges, that the revocation of his Program status (which to date has not been confirmed, defined or explained in writing) was nothing more than a pretext for cost-cutting in advance of the Delta merger; that defendants sought to lower their costs by revoking Program benefits, rights and privileges from Program members who asserted those benefits, rights and privileges.

40.     As the result of Northwest's actions outlined above, plaintiff has suffered damages in an amount to be determined at trial, as he wrongfully has been deprived of valuable Program benefits that were and are rightfully his, including, but not limited to, flight upgrades, accumulated mileage, loyalty program status or benefits on other airlines, and other advantages that came with his status in the Program.

## V. CLASS ALLEGATIONS

41.     Pursuant to Federal Rule of Civil Procedure 23, plaintiff brings this action against the defendants on behalf of himself and all other Program members whose Program status was revoked without valid cause during the class period, which is defined as the four years preceding the filing date of this Complaint. The practices and omissions of defendants were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All putative Class members were and are similarly affected by having had their Program status revoked, and the relief sought herein is for the benefit of plaintiff and members of the putative class. Plaintiff is informed and believes, and on that basis alleges, that the plaintiff Class is so numerous that joinder of all members would be impracticable. Based on the number of Program members, it is apparent that the number of parties subjected to the practices complained of here is substantial, thereby making joinder impossible.

42.     Questions of law and fact common to the plaintiff Class exist that predominate

over questions affecting only individual members, including, inter alia, the following:

      a.    Whether defendants breached their written contract with Program members by revoking their Program status without valid cause, thereby depriving them of the rights, privileges and benefits related to their Program status;

      b.    Whether defendants breached the covenant of good faith and fair dealing inherent in their contract with Program members, by revoking their Program status without valid cause, thereby depriving them of the rights, privileges and benefits related to their Program status;

      c.    Whether defendants' advertising, marketing and/or representations, contractual and other, regarding the Program was negligently deceptive to consumers;

      d.    Whether defendants' advertising, marketing and/or representations, contractual and other, regarding the Program was intended to deceive consumers;

      e.    Whether plaintiff and members of the Class suffered an ascertainable loss;

      f.    Whether any ascertainable loss suffered by plaintiff and members of the Class is the result of defendants' wrongful conduct;

      g.    Whether equitable relief is an appropriate remedy;

      h.    Whether punitive damages are an appropriate remedy; and

      i.    The measure of damages.

    43.    The claims asserted by plaintiff in this action are typical of the claims of the members of the plaintiff Class, as the claims arise from the same course of conduct by defendants, and the relief sought is common.

    44.    Plaintiff will fairly and adequately represent and protect the interests of the members of the plaintiff Class. Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

45.     Certification of this class action is appropriate under FRCP 23(b) because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative plaintiff or any other Class member would be able to protect their own interests, because the cost of litigation through individual lawsuits might exceed expected recovery. Certification also is appropriate because defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole. Further, given the large number of consumers of the Product, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

46.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that it would not be practicable to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI. FIRST CAUSE OF ACTION

## BREACH OF WRITTEN CONTRACT

### (Against All Defendants)

47.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

48.     Plaintiff and Class members have tendered performance and/or have substantially performed all of their obligations under their written Program contracts.

49.     As detailed above, defendants have failed to perform in accordance with the Program contract, revoking the Program statuses of plaintiff and Class members without valid

cause.

50.     Plaintiff and the Class members have suffered actual damages in an amount to be determined at trial, as they wrongfully have been deprived of valuable Program benefits that were and are rightfully theirs, including, but not limited to, flight upgrades, accumulated mileage, loyalty program status or benefits on other airlines, and other advantages that came with their status in the Program.

51.     Defendants' breaches are the actual and proximate cause of the damages suffered by plaintiff and the Class members.

52.     Plaintiff and the Class members are therefore entitled to: damages in an amount to be determined at trial in an amount sufficient to compensate them for the lost benefits, rights and privileges of their Program membership status; an order of this Court restoring to them the Program membership status they held prior to revocation; and an order of this Court enjoining defendants from the future revocation, without valid cause, of the Program statuses of Program members. The threat of such future revocations exists. There is no means available here to establish a remedy by way of damages for the future losses of plaintiff, Class members and members of the general public if the revoked Program statuses are not restored and future revocations without valid cause are not enjoined. Plaintiff, Class members and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if orders restoring the revoked Program statuses and enjoining future revocations without valid cause are not granted. Plaintiff and the Class members also respectfully request such other relief as the Court may deem proper.

## VII. SECOND CAUSE OF ACTION

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants)

53.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

54.     Plaintiff and Class members have tendered performance and/or have substantially performed all their obligations under the Program contracts.

55.     The duty of good faith and fair dealing is implied in the subject contracts.

56.     Under this implied term of the agreements, the good faith requirement precludes any action by defendants that would contravene the reasonable expectations of the plaintiff and Class members; even where a party to a contract is given absolute discretion, it must exercise that discretion in good faith in a manner consistent with the reasonable expectations of the other party or parties.

57.     Defendants are bound by the standardized terms of their Program contracts with plaintiff and the Class members. All such terms relevant to the claims set forth herein are identical in all material respects and have the same meaning in all jurisdictions. Plaintiff and Class members are entitled to have defendants apply those contracts in a reasonable manner consistent with the expectations created by those contracts and other representations.

58.     By virtue of the conduct set forth above, defendants deprived plaintiff and Class members of the benefit of their bargain, and breached the implied covenant of good faith and fair dealing inherent in their contracts.

59.     Defendants' breaches are the actual and proximate cause of the damages suffered by plaintiff and the Class members.

60.     Plaintiff and the Class members are therefore entitled to: damages in an amount to be determined at trial in an amount sufficient to compensate them for the lost benefits, rights and privileges of their Program membership status; an order of this Court restoring to them the Program membership status they held prior to revocation; and an order of this Court enjoining defendants from the future revocation, without valid cause, of the Program statuses of Program members. The threat of such future revocations exists. There is no means available here to establish a remedy by way of damages for the future losses of plaintiff, Class members and members of the general public if the revoked Program statuses are not restored and future revocations without valid cause are not enjoined. Plaintiff, Class members and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if orders restoring the revoked Program statuses and enjoining future revocations without valid cause are not granted. Plaintiff and the Class members also respectfully request such other relief

as the Court may deem proper.

## VIII. THIRD CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

61.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

62.     Defendants represented to Program members that they had certain rights, benefits and privileges as the result of their Program status, and that these would not be affected by the merger with Delta.

63.     Defendants' representations were untrue in that defendants deprived certain Program members of the rights, benefits and privileges related to their Program status by revoking their Program statuses without valid cause; actions which plaintiff on information and belief alleges was part of a program to reduce costs for the merger with Delta.

64.     Defendants made the representations herein alleged with the intention of inducing plaintiff and Class members to fly on their airline instead of other airlines, and to do so frequently.

65.     Plaintiff and the Class believed and relied on defendants' representations and, in reliance on those representations, loyally and frequently flew on defendants' airline, paying defendants a substantial amount of money in the process. This reliance was reasonable, in that defendants appeared to be reputable and trustworthy.

66.     At the time defendants made the misrepresentations herein alleged, defendants had no reasonable grounds for believing the representations to be true.

67.     As a proximate result of defendants' negligent misrepresentations, plaintiff and the Class members are therefore entitled to: damages in an amount to be determined at trial in an amount sufficient to compensate them for the lost benefits, rights and privileges of their Program membership status; an order of this Court restoring to them the Program membership status they held prior to revocation; and an order of this Court enjoining defendants from the future revocation, without valid cause, of the Program statuses of Program members. The threat

of such future revocations exists. There is no means available here to establish a remedy by way of damages for the future losses of plaintiff, Class members and members of the general public if the revoked Program statuses are not restored and future revocations without valid cause are not enjoined. Plaintiff, Class members and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if orders restoring the revoked Program statuses and enjoining future revocations without valid cause are not granted. Plaintiff and the Class members also respectfully request such other relief as the Court may deem proper.

## IX. FOURTH CAUSE OF ACTION

## INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

68.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

69.     Defendants represented to Program members that they had certain rights, benefits and privileges as the result of their Program status, and that these would not be affected by the merger with Delta.

70.     Defendants' representations were untrue in that defendants deprived certain Program members of the rights, benefits and privileges related to their Program status, without good cause; actions which plaintiff on information and belief alleges was part of a program to reduce costs for the merger with Delta.

71.     Defendants made the representations herein alleged with the intention of inducing plaintiff and Class members to fly their airline instead of other airlines, and to do so frequently.

72.     Plaintiff and the Class believed and relied on defendants' representations and, in reliance on those representations, loyally and frequently flew on defendants' airline, paying defendants a substantial amount of money in the process. This reliance was reasonable, in that defendants appeared to be reputable and trustworthy.

73.     At the time defendants made the misrepresentations herein alleged, defendants knew the representations were false.

74.     As a proximate result of defendants' fraud as alleged herein, plaintiff and the Class members are therefore entitled to: damages in an amount to be determined at trial in an amount sufficient to compensate them for the lost benefits, rights and privileges of their Program membership status; an order of this Court restoring to them the Program membership status they held prior to revocation; and an order of this Court enjoining defendants from the future revocation, without valid cause, of the Program statuses of Program members. The threat of such future breaches exists, and there is no means available here to establish a remedy for such future breaches by way of damages. Plaintiff, Class members and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. Plaintiff and the Class members also respectfully request such other relief as the Court may deem proper.

75.     Plaintiff is informed and believes and thereon alleges that defendants knew that the aforementioned representations were false when made and intended that plaintiff and members of the Class should rely on the representations. Plaintiff and the Class members reasonably relied on defendants' representations, all to their damage as hereinabove alleged. In doing the things aforementioned, defendants were guilty of malice, oppression, and fraud, and plaintiff and the Class are, therefore, entitled to recover exemplary or punitive damages.

## X. PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and all others similarly situated, and for members of the general public, prays for relief as follows:

(a) For an order certifying that this action may be maintained as a class action;

(b) For an order restoring to plaintiff and Class members the Program statuses they held prior to revocation;

(c) For an order enjoining defendants from future revocations of the statuses of Program members without valid cause;

(d) For an award of compensatory damages and any additional, consequential and incidental damages and costs suffered by plaintiff and members of the Class due to defendants' wrongful conduct;

1        (e) For an award of punitive damages for the Fourth Cause of Action;

2        (f) For an award of prejudgment interest, attorney's fees, costs of suit, including expert

3 witness fees; and

4        (g) For such other and further legal and equitable relief as this Court may deem proper.

5

                                    HEWELL LAW FIRM

6

7 Dated: January 4, 2009

8                                      By: Harold M. Hewell

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT LIST

| EXHIBIT | PAGES |
|---|---|

**Exhibit "A":**
Copy of letter dated July 18, 2008, from Kathy Johnston.   A-23

**Exhibit "B":**
Copy of email dated November 20, 2008, from Kathy Johnston.   B-25 - B-27

**Exhibit "C":**
Copy of "WorldPerks® General Membership Terms and
Conditions"
(http://www.nwa.com/worldperks/memrules/general.shtml).   C-29 - C-32

**Exhibit "D":**
Copy of Northwest's "Customer Service Commitments"
(http://www.nwa.com/plan/guide01.html).   D-34 - D-35

**Exhibit "E":**
Copy of 2008 North America Airline Satisfaction StudySM, released
June 17, 2008, by J.D. Power and Associates
(http://www.jdpower.com/corporate/news/releases/pdf/2008069.pdf).   E-37 - E-40

Exhibit "A"



Northwest Airlines, Inc.
Customer Care
Department C6850
7500 Airline Drive
Minneapolis MN 55450-1101
nwa.com

July 18, 2008

REF

SENT VIA FEDERAL EXPRESS

Mr. Sholom Ginsberg



Dear Mr. Ginsberg:

It has been brought to my attention that you have contacted our office 24 times since December 3, 2007 regarding travel problems, including 9 incidents of your bag arriving late at the luggage carousel. We have also received calls from you acting as a representative for Rafaella Ginsberg and Tzvi Ginsberg. As a result, I want to take this opportunity to extend to you, on behalf of all the employees at Northwest Airlines, our sincere apology for the many problems you have encountered with our service.

I have reviewed the text of all your telephone calls, as well as our responses. I believe our staff has attempted to show you in their words and actions that we are truly sorry your travel has not gone smoothly. Because of the nature of our industry, there will continue to be inconveniences caused to our passengers. You certainly deserve our apologies on these occasions.

Since December 3, 2007, you have continually asked for compensation over and above our guidelines. We have awarded you $1,925.00 in travel credit vouchers, 78,500 WorldPerks bonus miles, a voucher extension for your son, and $491.00 in cash reimbursements. These incidents certainly deserve an apology and we thank you for bringing them to our attention.

Due to our past generosity, we must respectfully advise that we will no longer be awarding you compensation each time you contact us. We will record your complaints so they receive internal attention and we will respond to you accordingly. If compensation is warranted and provided to other passengers for issues like a flight irregularity, you will receive like consideration.

We value your business and want to do a good job for you. If you have any questions, you may email me directly at Kathy.johnston@nwa.com.

Thank you for your understanding.

Sincerely,

Kathy M. Johnston
Coordinator
Customer Care

Exhibit "B"





-----Original Message-----
From██████████████████████████████████████████
Sent: Friday, November 21, 2008 3:13 AM
To:█████████████
Subject: Fw: WorldPerks Elite Status██████████████████████████


Sent from my BlackBerryR smartphone with SprintSpeed

-----Original Message-----
From: Northwest Airlines <Northwest.Airlines@nwa.com>

Date: Thu, 20 Nov 2008 15:19:29
To:████████████████████████████████
Subject: WorldPerks Elite Status █████████████████████████


Dear Mr. Ginsberg:

Thank you for your recent email. I appreciate the opportunity to follow up with you.

While we appreciate your business, we must also enforce the WorldPerks program terms and conditions. My records show our WorldPerks staff called you on June 26, 2008 advising you they were rescinding your Elite status and they asked you to return your Platinum card. As of this date, I understand the card has never been returned. I also understand you have had many conversation with our Legal Department on this same subject. After numerous conversations with not only the Legal Department, but with members of the WorldPerks department, I believe your status with the program should be very clear.

Please allow me to review Rule #7 of our WorldPerks Terms and

1

Conditions.  Rule #7 states the following.

"Abuse of the WorldPerks program (including failure to follow program
policies and procedures, the sale or barter of awards or tickets and any
misrepresentation of fact relating thereto or other improper conduct as
determined by Northwest in its sole judgment, including, among other
things, violation of the tariffs of Northwest or any Airline Partner
participant in the program, any untoward or harassing behavior with
reference to any Northwest employee or any refusal to honor Northwest
Airlines employees; instructions) may result in cancellation of the
members' account and future disqualification from program participation,
forfeiture of all mileage accrued and cancellation of previously issued
but unused awards. Any violation of these rules may result in
confiscation of tickets at any time (including en route) and the payment
by the WorldPerks member or passenger of the full applicable Y, C, J, F
or P fare for any segment traveled on program award tickets that have
been misused. In connection with the enforcement of any of the terms and
conditions governing the WorldPerks program, Northwest Airlines reserves
the right to take appropriate legal action, as it deems necessary, and
to recover damages, attorneys fees and court costs."

It has also been brought to my attention that you requested a
Continental Platinum Elite card through their other airline match
program.  Because you were not a Northwest Platinum Elite member when
you faxed them your Northwest card and requested the matching
Continental Platinum Elite card, Continental has also revoked your card
and asked that it be returned. That card has not been returned and, in
fact, you attempted to use it several times recently while traveling on
Northwest.

We believe that we have fully addressed your concerns, and communicated
your change in status with our program. Continued disregard of the
policies of this program may result in the termination of your
WorldPerks account.

Thank you for writing.

Sincerely,

Kathy Johnston
Coordinator
Customer Care
Northwest Airlines

Dear Ms. Johnston,

I received your letter dated July 18, 2008 and I am writing to seek
clarification as to my Platinum status.  Can you please be so kind and
inform me of why my status has been removed?  My worldperks number is
███████████████████

Thanks,

Sholom Ginsberg



\*\*\*\*\*\*\*\*\*\*\*\*\*\*

3

Exhibit "C"

WorldPerks General Membership Terms and Conditions

http://www.nwa.com/worldperks/memrules/general.shtml (1 of 4) [12/11/2008 4:16:32 AM]



## nwa WorldPerks®

Member's Guide > Membership Terms and

WorldPerks® General Membership Terms and Conditions



**Program Terms and Conditions**

1. Northwest Airlines® has the right to terminate the WorldPerks® program at any time.

2. Northwest may change the WorldPerks program rules, regulations, benefits, conditions of participation or mileage levels for awards, tickets and cities served, in whole or in part, at any time without notice, even though changes may affect the value of the mileage already accumulated. Northwest may change or terminate program partners, withdraw, limit, modify or cancel any award, increase the mileage required for any award, modify or regulate the transferability of awards or benefits, add an unlimited number of blackout dates or limit the number of seats available to any or all destinations. Northwest has the final say as to whether an itinerary qualifies for WorldPerks travel awards.

3. WorldPerks miles have no expiration date. However, consistent with the general terms and conditions of the WorldPerks program, Northwest Airlines reserves the right to change the WorldPerks program at any time without notice, including imposition of expiration limits or reactivation fees. If no mileage from any source is posted to a WorldPerks member's account for three consecutive years, the account is subject to termination, including forfeiture of all accrued mileage.

4. Northwest reserves the right to make WorldPerks Bonus Miles and promotional offers available to select members based on flight activity, geographic location, program participation or information supplied by the member.

5. All mileage and subsequent awards must be earned and used according to the terms and conditions of the WorldPerks program. Northwest has the right to make the final decision on whether an itinerary qualifies for WorldPerks travel awards.

6. As a condition of membership, WorldPerks members may receive WorldPerks mileage statements, WorldPerks program updates and other related materials at Northwest's discretion. Northwest reserves the right to cease mailing of WorldPerks program updates and related materials to any WorldPerks member.

7. Abuse of the WorldPerks program (including failure to follow program policies and procedures, the sale or barter of awards or tickets and any misrepresentation of fact relating thereto or other improper conduct as determined by Northwest in its sole judgment, including, among other things, violation of the tariffs of Northwest or any partner airline participant in the program, any untoward or harassing behavior with reference to any Northwest employee or any refusal to honor Northwest Airlines employees' instructions) may result in cancellation of the member's account and future disqualification from program participation, forfeiture of all mileage accrued and cancellation of previously issued but unused awards. Any violation of these rules may result in confiscation of tickets at any time (including en route) and the payment by the WorldPerks member or passenger of the full applicable Y, C, J, F or P fare for any segment traveled on program award tickets that have

WorldPerks General Membership Terms and Conditions

http://www.nwa.com/worldperks/memrules/general.shtml (2 of 4) [12/11/2008 4:16:32 AM]

been misused. In connection with the enforcement of any of the terms and conditions governing the WorldPerks program, Northwest Airlines reserves the right to take appropriate legal action, as it deems necessary, and to recover damages, attorneys' fees and court costs.

8. Northwest reserves the right to interpret and apply the policies and procedures communicated in these terms and conditions by Northwest, shall be final and conclusive in each case. These terms and conditions superseded all previously published terms and conditions.

9. Allow six to eight weeks for all mileage to be credited to your WorldPerks account.

10. From time to time, the data you have furnished to Northwest and KLM may be provided to WorldPerks Partners in the travel industry to enhance your travel experience and may be used to bring you relevant and valuable offers from these WorldPerks Partners. If you no longer wish to receive these communications, please contact the WorldPerks Service Center at 1-800-44PERKS.

11. Except as otherwise explained below, mileage credit is not transferable and may not be combined among WorldPerks members or conveyed by any means to anyone, including through a member's estate, and may not pass to members' successors and assigns. Accrued mileage credit and award certificates and award tickets do not constitute property of the member. Neither accrued mileage, award certificates nor tickets are transferable by the member (i) upon death, (ii) as part of a domestic relations matter or (iii) otherwise. Mileage earned from another frequent flyer program cannot be transferred to the WorldPerks program.

## Enrollment

12. The WorldPerks program is open to any individual with a mailing address in North America or in any country that has not prohibited participation in frequent flyer programs, with the exception of countries in Europe, Africa, the Middle East and the Indian Subcontinent. If you change your mailing address to Europe, Africa, the Middle East or the Indian Subcontinent, you can no longer earn miles in the WorldPerks program. Instead, your account should be transferred to KLM's Flying Blue Program. Once you change your address in WorldPerks Manage my Reservations, a card will be sent to your new address so that we may obtain the necessary signature. After the consent is received, existing mileage balances will be transferred to your new, or existing, Flying Blue account.

13. Corporations or other legal entities cannot be enrolled as members.

14. Only one person may be enrolled per WorldPerks account. An individual may have only one account and that must be in his/her real (legal) name. Membership will be listed under the participant's full name including title (Mr., Ms., etc.) and middle initial. To receive flight credit, the name on the ticket must match the name on the member's account exactly.

15. Membership is non-transferable.

16. Retroactive credit will not be given for flights taken prior to enrollment.

## Earning Flight Miles

17. Mileage accrual is based on the nonstop mileage between your origin and destination for each segment of the trip. A segment is defined as all travel under a single flight number. On connecting flights that require a change of plane and flight number, credit is given for each segment of the trip.

18. When making flight reservations, please confirm the airline is Northwest or a Northwest WorldPerks Airline Partner. Northwest is not responsible for notifying members of changes in partner participation in the WorldPerks program. List of WorldPerks Airline Partners.

19. Only published fares on Northwest, our SkyTeam® Global Alliance Partners or other WorldPerks Airline Partners (and on NWA WorldVacations unpublished fare types) qualify for mileage credit with the exception of travel on these fare types: frequent flyer program/discounted award travel, CATY international, VUSA, standby, infant, some select unpublished fares, some student fares, free, no value, bulk tickets, agency/industry discount tickets, back-to-back tickets, tickets booked and ticketed at select ARC locations and any other fares that are from time to time declared by Northwest to be (i) eligible for mileage accrual at a reduced rate or (ii) ineligible for mileage accumulation.

20. Last Minute Packages fares and some unpublished fares will earn 250 Bonus Miles per segment.

21. Flight cancellations due to any condition that Northwest, our SkyTeam Global Alliance Partners and/or other WorldPerks Airline Partners cannot control, including but not limited to weather delays, will not be granted award mileage credit. Passengers are entitled to mileage credit when rerouted on another carrier due to operational reasons which occur at the airport on the day of travel. The member may earn mileage credit for the original NW/KLM itinerary as ticket by requesting and completing a mileage credit request form.

22. You must actually travel to earn WorldPerks flight mileage. Miles will not be awarded on unused, forfeited, fraudulent or refunded tickets, or on additional tickets purchased on the same flight under the same name for any reason. Only the person named on the WorldPerks account and who actually flies can earn WorldPerks mileage, even if they purchase tickets for other people. Miles will not be awarded when a person checks in and improperly identifies under the same name as the member. Any fraudulent activity in connection with the program will

PAGE: 30 OF 40

cancel previously issued tickets, awards and certificates. An individual member may earn miles only once and in one frequent flyer program for the entire itinerary. Miles will not be awarded for extra seats purchased by such member for any reason.

23. In case of upgrades to First or Business Class, WorldPerks mileage credit will be awarded based on the actual class of service flown.

24. While Northwest, our SkyTeam Global Alliance Partners and our other WorldPerks Airline Partners make every attempt to provide accurate credit or mileage, it is the member's responsibility to retain necessary documents, such as boarding passes and ticket receipts, to be provided for retroactive credit.

## Earning WorldPerks Mileage Partner Miles

25. WorldPerks Mileage Partners, partner locations and partner offers are subject to change and termination, without notice, by Northwest or its partners. Northwest assumes no liability for these changes or for informing members of changes. Members should confirm partner status when making reservations or prior to completing transactions.

26. Some WorldPerks Mileage Partners allow members to convert points to WorldPerks miles. For Point-To-Miles conversions, miles cannot be converted back to points at any time for any reason.

27. All award travel must be via the routes of Northwest Airlines and WorldPerks Airline Partners. Awards may be limited to select routes or Northwest coded affiliate flights. Please refer to the Redeem Miles section for full details.

28. Award travel has no cash value and will not be refunded.

29. Mileage award levels are subject to change at any time without notice. Travel restrictions to certain destinations and additional blackout dates may be announced by Northwest at any time without notice. PerkSaver SM Awards are limited and subject to seat availability. These awards may not be available at peak times to prime destinations. Increased availability is offered through the PerkPass SM Award pricing option.

## Redeeming Miles for WorldPerks Award Travel

30. Partially or wholly unused award tickets, to remain valid, must be exchanged within 90 days after the date of first unflown flight. Unless exchanged as provided above, the ticket will have no value. More than one exchange per ticket may be made, if done in compliance with the foregoing rules. A non-refundable WorldPerks administrative fee will apply, per person, for each award ticket exchange. Administrative fees, per person, per ticket, are payable for changes involving a Northwest Agent, changes to a paper award ticket, or for changes made at nwa.com. Fees may vary in amount and will be USD. Platinum members are exempt from all fees except the fee to change the award from an E-Ticket to a paper ticket. Details.

31. If the first departure date on the ticket is missed, the wholly unused award ticket may be redeposited up to 90 days after the first departure date on the original ticket. Once travel has begun, no redeposit may be made. Miles can only be redeposited into the account from which they were redeemed. A non-refundable WorldPerks administrative redeposit fee per person, per ticket applies. All fees will be USD. Platinum members are exempt from this fee. Details.

32. Award tickets (including upgrades with miles) issued for someone other than the account holder via a Northwest Reservations agent or at an airport location within 10 days or less of the travel date will be subject to a non-refundable $50 USD WorldPerks administrative fee per person. The trip summary and receipt will be delivered to the account holder's address. This fee is exclusive of other applicable taxes and fees (including Customs, inspection, immigration, security, agriculture, facility and departure/arrival charges, any administrative fee and the September 11th U.S. Security Fee of up to $10 USD roundtrip). Details.

33. The sale, purchase, brokerage, resale, barter or exchange of WorldPerks award tickets or WorldPerks miles for compensation is expressly prohibited. Any violation of these rules will result in confiscation of tickets at any time (including en route), the payment by the WorldPerks member or the passenger of the full applicable Y, C, J, F or P fare for any segment traveled, the payment of damages, attorneys' fees and court costs, closure of the WorldPerks account, and forfeiture of miles accrued and unused awards that have been earned.

34. You are responsible for paying all applicable taxes and fees (including Customs, inspection, immigration, security, agriculture, facility and departure/arrival charges, any administrative fee, and the September 11th U.S. Security Fee of up to $10 USD roundtrip) and obtaining necessary travel documents for award travel. A non-refundable ticketing fee will apply to tickets issued via a Northwest Reservations call center or airport location, fee amounts may vary. In addition, a non-refundable fee of $50 USD per ticket will be charged for passengers who request paper tickets in E-Ticket eligible markets. A credit card will be required at time of booking to pay for any applicable fees and taxes.

35. Award travel that encounters a delay or cancellation by Northwest will be reaccommodated on Northwest, Continental, Delta or KLM, according

to Northwest guidelines, with the following exception: if reaccommodation options on Northwest, Continental, Delta or KLM is not available, off-line reaccommodation options will be offered to WorldPerks Elite members and customers traveling on the last flight of the day where the only alternative is an overnight stay.

## Redeeming Miles for WorldPerks Upgrade Awards on Northwest/KLM

36. The ticketing of an upgrade award option will be determined by the rules of the purchased fare and ticket designator. Be sure to advise your reservation agent if you have already purchased a ticket. Administrative fees, ticketing fees or departure fees may apply.

37. Upgrade options are valid for most members traveling on most published fare types (and on many NWA WorldVacations unpublished fare types) except for the following: frequent flyer program free/discounted award travel, VUSA passes, Visit USA fare, Round-The-World, Circle-The-Pacific, infant/child, Asian origin spouse fare, companion fares, Asian consolidator ID tickets, denied boarding compensation, free, no value, agency/industry discount tickets, charter flight tickets, senior discount tickets, student fares, Fly Later-Fly Free vouchers, CATY International, most unpublished fares, consolidator tickets issued on 01298 ticket stock, bulk tickets, any certificates, coupons, Bonus Miles or promotional offer/tickets, Northwest trans-Atlantic fares beginning with M/H/Q/V/L/T/K and Northwest trans-Pacific fares beginning with M/H/Q, V/L/T/K. Upgrades on NWA WorldVacations fares are handled by NWA WorldVacations, not WorldPerks.

38. Upgrading to J or P class is excluded when using WorldPerks upgrade awards.

39. Select or most Coach fares on trans-Atlantic and trans-Pacific flights may be upgraded to D or I class; only full-fare tickets can be upgraded to Z class.

40. WorldPerks mileage upgrades for trans-Atlantic and trans-Pacific itineraries are only available on eligible paid Northwest Y and B type fares, Continental Y and H type fares, and on KLM S and B type fares.

41. Upgrade awards do not apply to side trips or other fares sold in conjunction with award travel.

42. Upgrades, like all awards, cannot be ticketed in Central or South America, the South Pacific, Europe, Africa, the Middle East, the Indian Subcontinent or elsewhere in the Atlantic region.

43. WorldPerks non-Elite members may not use miles to upgrade to First Class on domestic itineraries when purchasing Northwest T and K type fares or Continental V, Q, T, S and L type fares. Northwest will determine the eligibility of new fare types as they become available.

44. If you have upgraded your paid ticket with WorldPerks miles and decide to downgrade the ticket back to Economy class, you may apply the value of your paid ticket toward the price of any new itinerary, and it will be subject to any applicable WorldPerks administrative fees as well as any applicable change fees associated with the paid ticket.

Exhibit "D"

Northwest Airlines nwa.com - "Customers First" Customer Guide

**nwa.**

Customers First > Customer Service Guide

# "Customers First" - Customer Service Commitments

## Northwest Airlines will:

1. Offer you the lowest fare available for which you are eligible for the date, flight and class of service you request when you call Northwest's telephone reservation line, or book travel and/or purchase a ticket at a Northwest airport.

2. Notify you in a timely manner at the airport and on board an affected aircraft of known delays, cancellations and diversions. And will offer you a clear and concise statement of our policies for how we will accommodate you if you are delayed.

3. Make every reasonable effort to return lost checked luggage within 24 hours and will attempt to contact any customer whose unclaimed, checked luggage contains a name and address or phone number.

4. Offer liability limit for luggage on domestic flights of $3,000.

5. Allow you to cancel a reservation without penalty through midnight the next day to give you an opportunity to check for lower fares through other distribution systems such as travel agents or the Internet. *Note: Midnight the next day is defined as midnight in the first city of the itinerary. Passenger is scheduled to depart from San Diego. The customer has until midnight Pacific time the next day to cancel.*

6. Issue refunds for eligible tickets within 7 days for credit card purchases and 20 days for cash purchases.

7. Properly accommodate customers with disabilities and special needs, and will disclose our policies and procedures for handling special needs customers, such as Unaccompanied Minors and customers with disabilities.

8. Meet your essential needs during long delays, and will make every reasonable effort to provide for food, water, restroom facilities and access to medical treatment for customers aboard an aircraft that is on the ground for an extended period of time.

9. Handle "bumped" customers with fairness and consistency. And will disclose to you, upon request at the time of ticketing, whether the flight on which you are ticketed is overbooked.

10. Disclose travel itinerary, cancellation policies, frequent flyer rules and aircraft configuration by disclosing to you:

  - At the time you make your reservation, any change of aircraft on a single flight with the same flight number.
  - Cancellation policies involving failures to use each flight segment coupon.
  - Rules, restrictions and an annual report on Northwest's WorldPerks frequent flyer program redemption.
  - Upon request, information regarding aircraft configuration, including seat size and pitch.

11. Ensure our codeshare partners make a commitment to provide consumer plans and policies comparable to the Northwest Customers First standards.

12. Ensure that you receive a response to your written complaints within 60 days of their receipt by our Customer Care department.

These 12 commitments have been incorporated into NWA's Contract of Carriage.

Purchase tickets online at www.nwa.com, call Northwest Airlines at 1-800-225-2525 (TTY 1-800-328-2298) or call your travel agent.



Search

Next Section

Exhibit "E"

**J.D. Power and Associates Reports:**
**Overall Satisfaction in the Airline Industry Declines to a Three-Year Low**
**Primarily Due to People Factors, Rather than High Prices**

Alaska Airlines, Continental Airlines and JetBlue Airways Rank Highest in Customer Satisfaction

**WESTLAKE VILLAGE, Calif.: 17 June 2008** — Deteriorating levels of customer service provided by airline staff—rather than high fares and additional charges for amenities—have led to a significant decline in customer satisfaction with airline carriers, according to the J.D. Power and Associates 2008 North America Airline Satisfaction Study[SM] released today. Overall satisfaction for the airline industry has declined in 2008 to its lowest level in three years.

The study finds that satisfaction with "people" factors—including knowledge, courtesy and helpfulness of reservation and gate agents, check-in staff and flight crew—has declined dramatically since 2007, and is the leading contributing factor to the overall decline in customer satisfaction with airlines in 2008. The decrease in satisfaction with people factors is more than twice as large as the decline in satisfaction with price factors.

"Across the airline experience, from check-in, to the flight, to deplaning, passengers are being affected by the ramifications of carriers making staff cutbacks and have expressed that performance and attitudes of airline staff are suffering," said Sam Thanawalla, director of the global hospitality and travel practice at J.D. Power and Associates. "In this unstable industry environment, it is critical that airlines invest in their employees as a means to enhance the customer experience, as there is a strong connection between employee satisfaction and customer satisfaction. Those airlines that focus on keeping their employees informed and motivated will be better able to change negative consumer sentiment and truly differentiate themselves."

The study measures overall customer satisfaction based on performance in seven measures (in order of importance): cost and fees; flight crew; in-flight services; aircraft; boarding/deplaning/baggage; check-in and reservation. Carriers are ranked in two segments: low-cost and traditional network. Low-cost carriers are defined as airlines that operate single-cabin aircraft with typically lower fares, while traditional network carriers are defined as airlines that operate multicabin aircraft and use multiple airport hubs.

**Low-Cost Carrier Rankings**
For a fourth consecutive year, JetBlue Airways ranks highest overall and also ranks highest in the low-cost carrier segment for a third consecutive year. JetBlue performs particularly well in six of seven customer satisfaction measures: aircraft; boarding/deplaning/baggage; check-in; cost and fees; flight crew; and in-flight services.

**Traditional Network Carrier Rankings**
Alaska Airlines and Continental Airlines each rank highest in the traditional network carrier segment, in a tie. Continental ranks highest in the segment for a third consecutive year.

Alaska performs particularly well in five of seven measures: aircraft; boarding/deplaning/baggage; check-in; flight crew and reservation, while Continental performs well in the cost and fees measure.

"While nearly all of the carriers in both segments experience declines in satisfaction since 2007, Alaska Airlines has managed to improve, particularly in satisfaction with the overall check-in experience," said Thanawalla. "Alaska Airlines and Air Canada are the only two carriers that improve overall in 2008, which is a particularly impressive feat in the current volatile industry environment."

(Page 1 of 2)

The study also finds the following key patterns:
- The percentage of flight reservations made online has increased from 87 percent in 2007 to 92 percent in 2008. Among traditional network carriers, 51 percent of reservations were made on the airline Web site in 2007, compared with 66 percent in 2008. For low-cost carriers, 78 percent of reservations were made on the airline Web site in 2007, compared with 85 percent in 2008.
- While complimentary meals are the most-desired amenity for Pre-Boomer, Baby Boomer and Generation X air travelers, in-flight movies are most desired by Generation Y passengers.
- The percentage of travelers who say they chose a particular carrier because of its rewards program has increased to 22 percent in 2008 from 14 percent in 2007. Price is the most frequently reported reason for choosing a carrier in 2008 at 39 percent, down from 42 percent in 2007.

The 2008 North America Airline Satisfaction Study measures customer satisfaction of both business and leisure travelers with major North American carriers. The study is based on responses from 19,701 passengers who flew on a major North American airline between April 2007 and March 2008.

For more information, read an article or view our ratings.

## Airline Satisfaction Supplement Report Findings
For the first time, J.D. Power and Associates Web Intelligence Research has supplemented the 2008 North America Airline Satisfaction Study with analysis of consumer-generated online conversations regarding airline-related issues. Analysis of online conversation between November 2007 and April 2008 finds that nearly 60 percent of consumer sentiment around the airline industry is negative. One of the primary drivers of these negative sentiments is related to flight cancellations.

Those airlines that proactively inform customers about the reasons for flight delays and other problems tend to generate more positive online consumer sentiment.

## About J.D. Power and Associates
Headquartered in Westlake Village, Calif., J.D. Power and Associates is a global marketing information services company operating in key business sectors including market research, forecasting, performance improvement, training, Web intelligence and customer satisfaction. The company's quality and satisfaction measurements are based on responses from millions of consumers annually. For more information on car reviews and ratings, car insurance, health insurance, cell phone ratings, and more, please visit JDPower.com. J.D. Power and Associates is a business unit of The McGraw-Hill Companies.

## About The McGraw-Hill Companies
Founded in 1888, The McGraw-Hill Companies (NYSE: MHP) is a leading global information services provider meeting worldwide needs in the financial services, education and business information markets through leading brands such as Standard & Poor's, McGraw-Hill Education, *BusinessWeek* and J.D. Power and Associates. The Corporation has more than 280 offices in 40 countries. Sales in 2007 were $6.8 billion. Additional information is available at http://www.mcgraw-hill.com.

## Media Relations Contacts:
Jeff Perlman                                      John Tews
Brandware Public Relations             J.D. Power and Associates
Agoura Hills, Calif.                             Troy, Mich.
(818) 317-3070                                 (312) 248-4119
jperlman@brandwaregroup.com    john.tews@jdpa.com
No advertising or other promotional use can be made of the information in this release without the express prior written consent of J.D. Power and Associates. www.jdpower.com.corporate

# # #
(Page 2 of 2)
NOTE: Two charts follow.

# J.D. Power and Associates
# 2008 North America Airline Satisfaction Study<sup>SM</sup>

## Overall Airline Satisfaction Index Scores
### *Traditional Network Carrier Segment*
(Based on a 1,000-point scale)

JDPower.com
**Power Circle Ratings™**
for consumers:



**Power Circle Ratings Legend**
○○○○○ *Among the best*
○○○○○ *Better than most*
○○○○○ *About average*
○○○○○ *The rest*

Source: J.D. Power and Associates 2008 North America Airline Satisfaction Study™

Charts and graphs extracted from this press release must be accompanied by a statement identifying J.D. Power and Associates as the publisher and the J.D. Power and Associates 2008 North America Airline Satisfaction Study™ as the source. Rankings are based on numerical scores, and not necessarily on statistical significance. JDPower.com Power Circle Ratings™ are derived from consumer ratings in J.D. Power studies. For more information on Power Circle Ratings, visit jdpower.com/faqs. No advertising or other promotional use can be made of the information in this release or J.D. Power and Associates survey results without the express prior written consent of J.D. Power and Associates.

# J.D. Power and Associates
# 2008 North America Airline Satisfaction Study<sup>SM</sup>

### Overall Airline Satisfaction Index Scores
### *Low-Cost Carrier Segment*
(Based on a 1,000-point scale)

JDPower.com
**Power Circle Ratings**™
for consumers:



included in the study but not ranked due to small sample sizes
ATA/American Trans Air

Source: J.D. Power and Associates 2008 North America Airline Satisfaction
Study℠

**Power Circle Ratings Legend**
⚪⚪⚪⚪⚪ Among the best
⚪⚪⚪⚪⚪ Better than most
⚪⚪⚪⚪⚪ About average
⚪⚪⚪⚪⚪ The rest

Charts and graphs extracted from this press release must be accompanied by a statement identifying J.D. Power and
Associates as the publisher and the J.D. Power and Associates 2008 North America Airline Satisfaction Study℠ as the
source. Rankings are based on numerical scores, and not necessarily on statistical significance. JDPower.com Power
Circle Ratings™ are derived from consumer ratings in J.D. Power studies. For more information on Power Circle Ratings,
visit jdpower.com/faqs. No advertising or other promotional use can be made of the information in this release or
J.D. Power and Associates survey results without the express prior written consent of J.D. Power and Associates.

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET



The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| RABBI S. BINYOMIN GINSBERG, as an individual consumer, and on behalf of all others similarly situated, | NORTHWEST, INC., a Minnesota corporation and DELTA AIR LINES, INC., a Delaware corporation |

**(b)** County of Residence of First Listed Plaintiff   Hennepin County, MN
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Harold M. Hewell, Hewell Law Firm, 105 West F St., San Diego, CA 92101, Tel.: 619-235-6854/Fax: 888-298-0177

Attorneys (If Known)

'09 CV 0028 JS NLS   BY FAX

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Class Action Fairness Act of 2005 (Defendants doing business in this district)

Brief description of cause: Breach of Contract, Breach of Covenant of Fair Dealing and Good Faith, Intentional and Negligent Misrepresentation
28 U.S.C. 1332

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 5,000,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE   01/07/2009

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 158817   AMOUNT $350—   APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

TAB 01/08/09

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 158817    — MB

# January 08, 2009
# 13:51:10

## Civ Fil Non-Pris
USAO #.: 09CV0028
Judge..: JANIS L. SAMMARTINO
Amount.:                    $350.00 CK
Check#.: D3055112

# Total→  $350.00

FROM: RABBI S BINYOMIN GINSBERG
      VS NORTHWEST INC, ET AL